No. 13-1315

**Oral Argument Not Scheduled.**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

PRAIRIE STATE GENERATING COMPANY, LLC
Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH
REVIEW COMMISSION

and

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION (MSHA),
Respondents.
_____

**On Petition for Review of the Decision by the
Federal Mine Safety and Health Review Commission
Issued July 16, 2012 and
A Decision of the Federal Mine Safety and Health Review Commission
Issued October 25, 2013**
_____
**BRIEF OF PETITIONER
PRAIRIE STATE GENERATING COMPANY, LLC**

RALPH HENRY MOORE, II
PATRICK W. DENNISON
JACKSON KELLY PLLC
Three Gateway Center
401 Liberty Ave., Suite 1500
Pittsburgh, PA 15222
412-434-8058
412-434-8062 fax
E-mail Address:
rhmoore@jacksonkelly.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

<u>Parties and Amici</u>

The parties below before the Federal Mine Safety and Health Review Commission ("Review Commission" or "Commission") and its Administrative Law Judge included the Secretary of Labor, Mine Safety and Health Administration ("MSHA") and Prairie State Generating Company, LLC ("Prairie State"), a coal industry employer that operates the Lively Grove Mine, a coal mine located in Washington County, Illinois. The mine was the subject of two citations MSHA issued, which Prairie State contested in administrative proceedings before Commission Administrative Law Judge Margaret Miller.

Petitioner is Prairie State Generating Company, LLC. Respondents are the Federal Mine Safety and Health Review Commission, an independent adjudicatory agency of the U.S. government and the Secretary of Labor.

No amici curiae are participating in this case.

<u>Rulings Under Review</u>

The rulings on appeal are the decisions of the Federal Mine Safety and Health Review Commission in <u>Secretary of Labor, Mine Safety and Health Administration (MSHA) v. Prairie State Generating Company, LLC</u> which is reported at 35 FMSHRC 1985 (Rev. Comm. July 16, 2010) (JA 21) and of the Federal Mine Safety and Health Review Commission ALJ that is reported at 32

FMSHRC 602 (ALJ Miller May 21, 2010) (JA 9) and at 35 FMSHRC 3272 (ALJ Miller October 25, 2013) (JA 45) (Decision on Remand).

**Related Cases**

This case was not previously before any other United States Court of Appeals or federal Court. There was a related case (involving the same issue) that was decided by the U.S. Court of Appeals for the Seventh Circuit at 728 F.3d 643 (7th Cir. 2013). A petition for a writ of certiorari of that case was filed and certiorari was denied on April 21, 2014 at 820 SLW 3371, 2014 WL 151720 (U.S.).

## CORPORATE DISCLOSURE STATEMENT

Prairie State Generating Company, LLC is the owner and operator of the Lively Grove Mine, which is at issue here.  Prairie State Generating Company, LLC is engaged in the business of coal mining.  Prairie State Generating Company, LLC is a limited liability company, and it has nine members as follows:

    a.      American Municipal Power, Inc.

    b.      Illinois Municipal Electric Agency

    c.      Indiana Municipal Power Agency

    d.      Missouri Joint Municipal Electric Utility Commission

    e.      Kentucky Municipal Power Agency

    f.      Northern Illinois Municipal Power Agency

    g.      Southern Illinois Power Cooperative

    h.      Prairie Power, Inc.

    j.      Peabody Energy

Peabody Energy has issued shares to the public.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...............i

CORPORATE DISCLOSURE STATEMENT .........................................................iii

TABLE OF AUTHORITIES ................................................................................vi

GLOSSARY .....................................................................................................ix

JURISDICTIONAL STATEMENT .......................................................................1

    I.    Jurisdiction of Agency .........................................................................1

    II.   Jurisdiction of the U.S. Court of Appeals for the District of
         Columbia Circuit ..............................................................................2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..............................2

STATUTES AND REGULATIONS ......................................................................4

STATEMENT OF FACTS ..................................................................................4

    I.    Statutory and Regulatory Background ..................................................4

    II.   Factual Background of the Citations ....................................................7

CASE HISTORY .............................................................................................13

    I.    The ALJ's Decision ...........................................................................13

    II.   Review Commission's Decision ..........................................................15

    III.  The ALJ's Decision on Remand .........................................................16

STANDING....................................................................................................17

SUMMARY OF ARGUMENT .............................................................................19

ARGUMENT ...................................................................................................20

    I.    The Commission Should Not Have Affirmed the ALJ's
         Application of an Arbitrary and Capricious Standard
         to Determine if Prairie State's Plans Met the Requirements
         of the Standards ................................................................................20

         A.    The Application of an Arbitrary and Capricious Standard is
             Inconsistent with the ALJ's Role ...............................................30

       1.     The Commission's Approval of the Exclusion of
Evidence Was Improper.....................................................33

II.     The Commission Erred in Not Reversing the ALJ When She
Did Not Hold that the District Manager Acted Arbitrarily and
Capriciously When He Applied Policy as a Binding Norm..................37

III.    An Examination of the Specific Plan Provisions Indicates
the ALJ Erred in Upholding the District Manager's Decision ..............41

    A.     Extended Cuts............................................................41

    B.     Width of Entries and Length of Diagonals ..................................49

    C.     Ventilation Quantities .................................................53

CONCLUSION .................................................................56

Addendum A ...................................................................59

## TABLE OF AUTHORITIES

**Page**

**Cases**

Alabama By-Products, 4 FMSHRC 2128 (Rev. Comm. December 1982)............34

*Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962) ................................36

Butz v. Economu, 438 U.S. 478 (1978)................................................................32

*Carbon County Coal Co., 6 FMSHRC 1123 (Rev. Comm. May 1984) ...27, 40, 41

*Carbon County Coal Co., 7 FMSHRC 1367 (Rev. Comm.
      Sept. 1985)................................................................ 6, 21, 40, 41

Consolidation Coal Co., 11 FMSHRC 966 (Rev. Comm. June 1989) ..................31

C.W. Mining, 18 FMSHRC 1740 (Rev. Comm. Oct. 1996).......................21, 25, 27

Elk Run Coal Co. v. U.S. Dep't of Labor, 804 F. Supp. 2d 8 (D.D.C. 2011)...........6

Emerald Coal Resources LP, 29 FMSHRC 956 (Rev. Comm.
      Dec. 2007) ...................................................................25, 26, 27

Jim Walter Resources, Inc., 28 FMSHRC 579 (Rev. Comm. August 2006)..........27

Kennecott Greens Creek Mining Company v. MSHA, 476 F.3d 946
      (D.C. Cir. 2007) ...........................................................................28

Kenny Richardson, 3 FMSHRC 8 (Rev. Comm. January 1981)............................31

Mach Mining, LLC, 32 FMSHRC 149 (ALJ Miller Jan. 2010), aff'd 34
      FMSHRC 1784 (Rev. Comm. 2012), aff'd 728 F.2d 643
      (7th Cir. 2013) ................................................................28, 29

Mach Mining, LLC v. Secretary of Labor, 728 F.2d 643 (7th Cir. 2013) .........28, 29

Martin County Coal Company, 28 FMSHRC 247 (Rev. Comm. May 2006)........27

Midwest Materials Co., 19 FMSHRC 30 (Rev. Comm. January 1997) ................42

Motor Vehicle Mfr's Ass'n v. State Farm Auto Ins. Co., 463 U.S. 29 (1983) .......33

National Industrial Sand Ass'n v. Marshall, 601 F.2d 689 (3rd Cir. 1979)............28

National Mining Association v. Secretary of Labor, 589 F.3d 1268
      (11th Cir. 2009) ...........................................................................38

*Case principally relied upon

Peabody Coal Co., 15 FMSHRC 381 (Rev. Comm. March 1993)........................21

Peabody Coal Co., 18 FMSHRC 686 (Rev. Comm. May 1996).......................6, 21

Peabody Midwest Mining LLC, 32 FMSHRC 892 (ALJ Manning
    July 2010) ..........................................................................................39, 48

Plateau Mining Corp. v. FMSHRC, 519 F.2d 1176 (10th Cir. 2008)....................42

Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994) ..........................................6

Twentymile Coal Co., 30 FMSHRC 736 (Rev. Comm.
    Aug. 2008)............................................................. 26, 27, 33, 35, 48

United Mine Workers of America v. Dole, 870 F.3d 662 (D.C. Cir. 1989) .....24, 40

United States v. Mead Corp., 533 U.S. 218 (2001) ...............................................29

*Zeigler Coal Co. v. Kleppe, 536 F.2d 398 (D.C.
    Cir. 1976)......................................................6, 16, 22, 23, 24, 27- 29, 39, 40

**United States Code**

5 U.S.C. § 554 ....................................................................................................31, 32
5 U.S.C. § 554(c)(2)...................................................................................................30
5 U.S.C. § 556 ....................................................................................................30, 32
5 U.S.C. § 556(c) .......................................................................................................32
5 U.S.C. § 556(d) ......................................................................................................32
5 U.S.C. § 706 ....................................................................................................31, 32

Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801 et seq.

30 U.S.C. § 811 ...........................................................................................................5
30 U.S.C. § 811(a) ....................................................................................................39
30 U.S.C. § 814(a) .............................................................................................1, 4, 6
30 U.S.C. § 815(a) .......................................................................................................6
30 U.S.C. § 815(d) .......................................................................................1, 4, 6, 30
30 U.S.C. § 816(a) .......................................................................................................4
30 U.S.C. § 816(a)(1) ...........................................................................................2, 18
30 U.S.C. § 823 ...........................................................................................................4
30 U.S.C. § 823(d) ..................................................................................................4, 6
30 U.S.C. § 862(a) .............................................................................................4, 5, 20
30 U.S.C. § 863(o)............................................................................................4, 5, 20
30 U.S.C. § 876(b)(2)(A) ..........................................................................................26

30 U.S.C. § 961 ..........................................................................................4

**Standards**

29 C.F.R. § 2700.............................................................................32
29 C.F.R. § 2700.1(b) .....................................................................32
29 C.F.R. § 2700.63(b) ...................................................................31
29 C.F.R. § 2700.69(a)....................................................................15
30 C.F.R. § 75.220...................................................................20, 30
30 C.F.R. § 75.220(a)(1)............................................................4, 5, 21
30 C.F.R. § 75.323...........................................................................45
30 C.F.R. § 75.342(c) .....................................................................45
30 C.F.R. § 75.362(d) .....................................................................45
30 C.F.R. § 75.370...........................................................................20
30 C.F.R. § 75.370(a)(1)........................................................4, 5, 21, 30

## <u>Rules</u>

D.C. Circuit Rule 28(a)(7) ..............................................................17
Federal Rule of Appellate Procedure 28.1(c)(2)...................................17

## <u>Other</u>

Administrative Law and Practice § 11.22......................................28, 36
MSHA, U.S. Dep't of Labor, 5 <u>Program Policy Manual</u> (Feb. 2004,
    release V-33) ...........................................................................6
MSHA Program Policy Letter, P06-V-8 (July 21, 2006)......................26
MSHA Program Policy Letter, P06-V-9 (August 14, 2006)...................26
MSHA Program Policy Letter, P06-V-10 (October 24, 2006)................26
MSHA Procedure Instruction Letter No. 106-V-06 (July 12, 2006).......12
MSHA Procedure Instruction Letter No. 108-V-03 (June 3, 2008) .....13, 37
S. Rep. No. 95-181, 95th Cong., 1st Sess. 25 (1977)............................24
1 Richard J. Pierce, <u>Admin. L. Treatise</u> § 8.2, at 702-03 (5th Ed. 2010)..........30, 31
2 Am. Jur. 2d Admin. Law § 932 .....................................................31
71 Fed. Reg. 12252 (2006)...............................................................26
71 Fed. Reg. 71430 (2006)...............................................................26
76 Fed. Reg. 54163 (2011)...............................................................46

# GLOSSARY

The following abbreviations and acronyms are used in this brief:

ALJ:  Administrative Law Judge Margaret Miller

APA:  Administrative Procedure Act, 5 U.S.C. § 552

Commission:  Federal Mine Safety and Health Review Commission

JA:  Designates references to the Joint Appendix

ERP:  Emergency response plans developed under the Mine Improvement New Emergency Response Act of 2006, PL 109-236 (June 15, 2006)

Mine Act:  The Federal Mine Health and Safety Act of 1977, 30 U.S.C. § 801 et seq.

MINER Act: Mine Improvement New Emergency Response Act of 2006, PL 109-236 (June 15, 2006)

MSHA:  Mine Safety and Health Administration

1969 Act:  Federal Coal Mine Safety and Health Act of 1969, P.L. 91-173, 83 Stat. 742

Lively Grove: Lively Grove mine

NIOSH:  National Institute of Occupational Safety and Health

PIL:  Procedure Instruction Letter

Review Commission:  Federal Mine Safety and Health Review Commission

The Secretary:  Secretary of Labor, Mine Safety and Health Administration

Working section: the area of a coal mine from the end of the conveyor, i.e., the loading point, to the working faces where the coal is cut and removed as mining progresses.

# JURISDICTIONAL STATEMENT

## I.    <u>Jurisdiction of Agency</u>

The Federal Mine Safety and Health Review Commission ("Review Commission" or "Commission") had subject-matter jurisdiction over this matter based upon Section 105(d) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. § 815(d).  Petitioner Prairie State Generating Company, LLC ("Prairie State") was issued two technical Citations under Section 104(a) of the Mine Act, 30 U.S.C. § 814(a), on September 17, 2009.[1]  The Citations were contested by Prairie State before Administrative Law Judge Margaret Miller ("ALJ") who upheld the Citations in a decision reported at 32 FMSHRC 602 (JA 9).  Prairie State then petitioned for review by the Commission.  Review was granted on June 30, 2010 (JA 3).  The Commission affirmed the ALJ in part and reversed her in part and remanded a portion of the case in a decision reported at 35 FMSHRC 1983 (Rev. Comm. July 16, 2013) (JA 21).  On remand before the ALJ, the parties agreed to limit the issues and the ALJ entered her decision on remand on October 25, 2013 and reported at 35 FMSHRC 3272 (JA 45).  Prairie State

---

[1]    References to the Joint Appendix are designated "JA."  References to the transcript of the hearing in this matter are designated "Tr." along with the JA references.  References to the ALJ's decision are to the copies contained in the Joint Appendix (JA 9).  References to the Commission's decision are to the copy contained in the Joint Appendix (JA 21).  References to the ALJ's decision on remand are to the copy contained in the Joint Appendix (JA 45).

sought review of such decision and further review was denied on December 2, 2013 (JA 51). Prairie State filed its Petition for Review with this Court on December 30, 2013.

## II. Jurisdiction of the U.S. Court of Appeals for the District of Columbia Circuit

The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit over the instant case is established by Section 106(a)(1) of the Mine Act, 30 U.S.C. § 816(a)(1). The initial decision by the ALJ was issued May 21, 2010 (JA 9). Prairie State filed a petition for discretionary review of that decision, which was granted on June 30, 2010 (JA 3). The Commission's decision remanding the case to the ALJ was issued on July 16, 2013 (JA 4, 21). The ALJ's decision on remand was issued on October 25, 2013 (JA 45). Review of the decision on remand by the Commission was denied on December 2, 2013 (JA 51). Prairie State's Petition for Review was timely filed on December 30, 2013 with this Court within 30 days of the denial of review becoming a final order of the Commission. The Petition for Review to this Court is from a final order of the Review Commission.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues addressed by Prairie State are as follows:

1. Whether the Commission erred in holding that the appropriate standard of review of a District Manager's decision to reject certain provisions in

an operator's roof control and ventilation plans was an arbitrary and capricious standard.

2.      Whether the Commission applied the improper standard of proof when it permitted the ALJ to evaluate the suitability of MSHA's proposed plans rather than the operator's in a fashion that was contrary to law.

3.      Whether the Commission erred in upholding the exclusion by the ALJ of evidence of plans at other mines, research conducted by MSHA at mines in District 8 and research done by the National Institute of Occupational Safety and Health ("NIOSH").

4.      Whether the Commission erred in upholding the ALJ's refusal to rely upon or consider expert evidence concerning issues involving the plans because it was not presented to the District Manager.

5.      Whether the Commission erred in holding that the District Manager's decisions on the specific plan provisions herein were proper when they involved the application of across-the-board plan requirements and were contrary to law.

6.      Whether the Commission erred when it ignored relevant data readily available to the District Manager concerning significant safety benefits from the Prairie State plans and other data relevant to the issues before him.

7.      Whether the Commission's holding that the District Manager did not act arbitrarily and capriciously was supported by substantial evidence.

- 3 -

## STATUTES AND REGULATIONS

The applicable mandatory standards are 30 C.F.R. § 75.370(a)(1) and 30 C.F.R. § 75.220(a)(1) are set forth in Addendum A to this Brief. The applicable statutory provisions are Section 104(a), 30 U.S.C. § 814(a), Section 302(a), 30 U.S.C. § 862(a) and Section 303(o) of the Mine Act, 30 U.S.C. § 863(o), which are also set forth in Addendum A.

## STATEMENT OF FACTS

## I.    <u>Statutory and Regulatory Background</u>

Congress created the Mine Safety and Health Administration ("MSHA") to administer and enforce the Mine Act and its implementing regulations and standards on behalf of the Secretary of Labor. Congress also created the Review Commission as an independent commission to, among other things, adjudicate enforcement disputes, i.e., mine operator contests of MSHA citations and orders for alleged violations of the Mine Act or MSHA's standards. <u>See</u> 30 U.S.C. §§ 823, 961. Commission hearings are governed by the Administrative Procedure Act ("APA") hearing standards, 30 U.S.C. § 815(d), and are conducted in the first instance by the administrative law judges employed by the Commission. Review of ALJ decisions by the Commission is discretionary, and further review by an appropriate federal court of appeals is allowed as a matter of right. <u>See</u> 30 U.S.C. §§ 816(a), 823(d).

- 4 -

MSHA typically regulates mining by application of mandatory health and safety standards promulgated through notice and comment rulemaking.  30 U.S.C. § 811.  There are exceptions to this process, and two of the exceptions are mine specific ventilation and roof control plans.  Those are developed through a process that takes place at the MSHA district level.[2]

A mine operator may not lawfully operate its coal mine without a ventilation or roof control plan approved by the MSHA district manager, that is "suitable to the conditions and the mining system" at the mine.  See 30 U.S.C. § 862(a) and § 863(o).  Among other things, a coal mine's ventilation plan establishes the mandatory mine-specific procedures for directing air underground and removing dust and gases from the underground work environment.  The mine's roof control plan establishes the procedures for supporting the roof after coal is mined. Violations of the plans are subject to both civil and criminal enforcement.

The Secretary has developed mandatory standards that require an operator to "develop and follow a ventilation plan approved by the district manager."  See 30 C.F.R. § 75.370(a)(1).  Similarly, the operator "shall develop and follow a roof control plan approved by the District Manager."  See 30 C.F.R. § 75.220(a)(1).

---

[2]      There are 12 MSHA districts that encompass the various portions of the country where coal mining occurs.  Each district has a district manager.  The District Manager here had no educational qualifications that the Secretary thought worth eliciting (JA 107, Tr. 207-8) and was not a mining engineer or any type of engineer.  He had only been a District Manager for approximately two years.

The process of development, as historically contemplated, by the various parties was one of good faith negotiation between the operator and MSHA district.  See, e.g., Carbon County Coal, 7 FMSHRC 1367, 1371 (Rev. Comm. Sept. 1985).

When a dispute over the suitability of a plan arises, the operator has the right to a hearing.  See Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 407 (D.C. Cir. 1976); Elk Run Coal Co. v. U.S. Dep't of Labor, 804 F. Supp. 2d 8, 26 (D.D.C. 2011); Peabody Coal Co., 18 FMSHRC 686 (Rev. Comm. May 1996).

The procedure for how an operator obtains a hearing for a mine plan dispute is described in an MSHA policy: if, after negotiations, the operator and MSHA find themselves at an impasse over the suitability of a proposed mine-plan provision, MSHA issues the operator a citation under Section 104(a) of the Mine Act, 30 U.S.C. § 814(a), that the operator can contest before the Commission.  See, MSHA, U.S. Dep't. of Labor, 5 Program Policy Manual ("PPM") at 4 (Feb. 2003, release V-33); 30 U.S.C. § 814(a).  It is normally a technical citation.  The citation is necessary because, once contested by the operator, it gives rise to Commission jurisdiction.  See, 30 U.S.C. §§ 815(a), (d), 823(d); Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207-08 (1994).

## II.    Factual Background of the Citations

### Preliminary Background

Prairie State has constructed the Lively Grove Mine ("Lively Grove"), an underground coal mine that began mining coal on September 10, 2009; it is expected to produce over six million tons of coal per year using continuous mining equipment (JA 176, Stip. 2; JA 120 Tr. 259).  Lively Grove will be the sole source of fuel for a 1,600 megawatt generating facility that was under construction adjacent to the mine (JA 176, Stip. 3; JA 120, Tr. 259, 260).

The process of mining involves the use of a machine known as a continuous miner to take "cuts" of coal from the coal seam.  A continuous miner is a large machine with a rotating head that cuts the coal, which is then conveyed through the machine and dumped into a shuttle car that transports it to a conveyor belt for removal from the mine.  The continuous miner is electrically powered and operated by remote control.  Once the miner takes a cut, it is then moved to the next entry to perform a similar function and the roof in the entry where the coal was removed is supported, usually with roofbolts of various lengths.   The continuous miner develops a set of entries which are approximately 18-20 feet wide.  These entries are connected at regular intervals by entries of similar size called crosscuts, leaving a rectangular block of coal that supports the roof and is between 40-150 feet on

each side.    The result is a grid like pattern of entries and crosscuts, with the remaining pillars of coal (See JA 193, 195).

Ventilation is induced through the mine by a fan on the surface.  It is directed in the mine entries by ventilation controls between entries in the crosscuts to separate air currents.  Air coming into the mine is intake air.  Air coming out of the mine after it has ventilated the working faces where coal is cut is return air. The main ventilation current is "split" as it travels through the mine in order to separately ventilate each working section.

## The Plan Development Process

In or around July of 2008, Prairie State began the process of obtaining approval for ventilation and roof control plans from MSHA Coal Mine Safety and Health District 8 ("District 8") (JA 177, Stip. 4).  After months of discussions and numerous revisions to the plans, Prairie State and MSHA were unable to reach agreement on portions of the ventilation and roof control plans, and MSHA issued technical citations to Prairie State in September 2009 after production of coal had begun (JA 177, Stip. 5).

When Prairie State began to prepare its ventilation and roof control plans for the Lively Grove Mine, it had extensive information available about the conditions that would be encountered (JA 129-30, Tr. 296-97).   There were over 600 coreholes in the coal reserve that was to be mined that indicated the strata above

- 8 -

the coal seam (JA 128, Tr. 291). It had determined that the roof in the mine consists primarily of Brereton limestone, which provides strong and competent roof (JA 139, Tr. 336; JA 171, Tr. 462). Prairie State personnel had worked in nearby mines in the same seam and were familiar with the ground conditions (JA 127, Tr. 287; JA 145, Tr. 358). It studied information as to the number of roof falls at other mines (JA 145, Tr. 359-60). It had available plans that had been approved at other mines in MSHA District 8 (JA 129, Tr. 294; JA 131, Tr. 302). The proposed roof control plan included provisions for width of entries, lengths of intersection diagonals at crosscuts and length of cuts that were common in District 8 (JA 124, Tr. 294).

Similarly, with respect to ventilation, Prairie State had first-hand information that the nearby mines had not had significant methane issues, and it also analyzed the official MSHA and state methane liberation data from nearby mines as well as the respirable dust and quartz data (JA 128-29, Tr. 292-93).[3] Prairie State planned to use ventilation quantities tailored to mining on a working section with two continuous miners using a method of ventilation known as "fishtail" ventilation where the air coming to the section is split into two branches and each branch ventilates one side of the section and a portion of the faces to be mined in a

---

[3]    Ventilation is used, in part, to keep respirable coal dust and methane at acceptable levels in the mine.

working section (JA 130, Tr. 300; see, e.g. JA 195).[4] This type of ventilation is more effective for control of respirable dust, as opposed to one split of air ventilating all the mining faces in sequence across a working section (JA 130, Tr. 300; JA 153, Tr. 391-92). Prairie State was planning the mine ventilation system on the assumption that such a system would provide compliance with a reduced respirable dust standard of 1.0 mg/m$^3$, which was being discussed as a regulatory change by MSHA (JA 130, Tr. 300).

Starting in August 2008 there were discussions with MSHA personnel in District 8 about the ventilation and roof control plans (JA 130, Tr. 297). Initially MSHA indicated that entry widths of 19 and 20 feet could be approved but in January 2009 that position changed (JA 130, Tr. 298-99; JA 147, Tr. 367).[5]

On January 20, 2009, Prairie State personnel were told by MSHA personnel that the "targets" had changed and that all new mines were required to start with 18-foot widths in the mains entries (JA 123, Tr. 269; JA 131, Tr. 302; JA 147, Tr. 368). The MSHA personnel also stated that no mine operator would receive approval for 40-foot cuts without first getting approval for 20-foot cuts, followed by additional MSHA evaluations and approvals for incremental increases in cut

---

[4]    A working section is the area of a coal mine from the end of the conveyor, i.e., the loading point, to the working faces where the coal is cut and removed as mining progresses.

[5]    The 19-foot width would be in mains entries and the 20-foot in the rooms or panels mined off the mains entries (see, e.g., JA 408).

depth up to 40-feet (JA 123, Tr. 270). MSHA maintained those positions until the technical citations were issued (JA 123, Tr. 270-1).

It had become clear that MSHA and Prairie State would not be able to agree on a number of the key issues, including extended cuts, entry widths and intersection diagonals and ventilation quantities (JA 124, Tr. 273). The District was adopting "across-the-board" practices on these issues and no mine would be permitted to include any different plan provisions, although such plans had been approved at other mines not only in District 8 but in other Districts nationwide (JA 123, Tr. 272).

At a June 11, 2009 meeting, Prairie State requested that the District Manager issue technical citations because it was clear the parties were at an impasse (JA 124, Tr. 274). There were additional discussions over the course of the summer, including a meeting on August 6, 2009 between Prairie State personnel and District 8 personnel, where the District Manager again indicated that he would not approve any widths above 18-feet as an across-the-board approach (JA 137, Tr. 325-26; JA 148-49, Tr. 372-73). The District Manager also indicated that the same approach would apply to other issues such as extended 40-foot cuts (JA 137, Tr. 325; JA 148-49, Tr. 371-73).

The plans that would be implemented to abate the technical citations that were issued were finalized on August 28, 2009 (JA 347, 373). Once Prairie State

began mining on September 10, 2009 and "resubmitted" the July 31, 2009 plans

and MSHA prepared deficiency letters, the technical Citations, Nos. 6680548 and

6680549, were finally issued on September 17, 2009.

## The Disputed Provisions

There are a number of disputed issues between the parties that remain in

dispute, including, but not limited to, the following:

> a.    The use of cuts of 40 feet in depth;

> b.    The width of entries and the length of diagonals at intersections:  whether the width should be 20 feet and the sum of the diagonals 68 feet;

> c.    The amount of air required in the last open crosscut: whether it should be 9,000 cfm and 12,000 cfm, depending on the number of open crosscuts.[6]

## MSHA Policies

The use of remote control continuous miners permits the taking of cuts

beyond a 20-foot depth because the miner operator can remain under supported

roof.  Continuous miners are approximately 38 feet long.  Such cuts have been in

use for a number of years and the majority of mines utilize this type of cuts (JA

164, Tr. 433-34).  MSHA has issued two policy documents with respect to the

depth of cuts beyond 20 feet:  MSHA Procedure Instruction Letter No. 106-V-06

(July 12, 2006), Procedures for Evaluation of Requests to Make Extended Cuts

---

[6]    The list includes fewer issues than what was appealed to the Commission. The parties agreed before the ALJ on remand to limit some of the issues (JA 45).

with Remote Controlled Continuous Mining Machines (JA 283) and MSHA Procedure Instruction Letter No. 108-V-03 (June 3, 2008), Procedures for Evaluation of Requests to Make Extended Cuts with Remote Controlled Continuous Mining Machines (JA 293).

The District Manager testified that he considered the latter document to be binding and to preclude him from approving 40-foot cuts (JA 111, Tr. 223-24; see also JA 102, Tr. 185; JA 105, Tr. 200). While no national policy documents have been issued concerning other matters at issue here, District 8 applied across-the-board requirements with respect to width of entries, diagonal sums, and ventilation quantities (JA 82, Tr. 106-07; JA 101, Tr. 182-83; JA 103, Tr. 190; JA 112, Tr. 225-26; JA 115, Tr. 237-38).

## CASE HISTORY

### I.    The ALJ's Decision

On May 21, 2010, the Administrative Law Judge issued a decision affirming the technical citations (JA 9). Citing the discretion vested in district managers to insist upon plan provisions, the ALJ held that the District Manager did not abuse his discretion in insisting upon MSHA's roof and ventilation plan provisions. She evaluated the suitability of MSHA's proposed plan provisions, in contrast to those proposed by Prairie State.

- 13 -

The ALJ concluded that the District Manager's decision was not arbitrary and capricious, which she determined was the appropriate standard, along with "some element of reasonableness" (JA 18).  The ALJ rejected claims by Prairie State that it was improper to apply the Procedure Instruction Letter as though it were a binding rule (JA 16).  Rather, she found the performance-based approach advocated by the government, as embodied in the PIL, "reasonable" (JA 19).  The ALJ further concluded that the evidence established the suitability of MSHA's performance-based approach (JA 19).

The ALJ also denied Prairie State's contention that the District Manager failed to review all relevant facts, finding that he had reviewed all relevant evidence before him (JA 18).  She concluded that the District Manager's decision was not undermined by his failure to consider evidence that was not specifically placed before him and indicated she would not assume he was familiar with studies done in his own district or elsewhere within the industry by NIOSH (JA 18).  Finally, the ALJ affirmed her decision excluding from evidence other mines' in District 8 approved ventilation and roof control plans (JA 19).  She also excluded evidence concerning studies of extended cut ventilation both from District 8 mines and from national studies (JA 19).  She rejected expert testimony offered by Prairie State because it had not been presented to the District Manager (JA 19).

- 14 -

## II.    Review Commission's Decision

On review, the Commission, in a 2-1 decision, affirmed in part and vacated and remanded in part the ALJ's initial decision.[7] The majority found that the ALJ applied the correct legal standard, i.e., whether the District Manager's determinations regarding the proposed plans were arbitrary, capricious or an abuse of discretion (JA 25). They rejected longstanding case law that the Secretary has the burden of showing the unsuitability of the operator's plans and the suitability of MSHA's plan (JA 25-26). They also assumed that the District Manager, by rejecting Prairie State's plans, found them unsuitable, although he never testified to that (JA 25, n.6). Applying that standard, the Commission then found that the ALJ's findings regarding the District Manager's refusal to approve the use of 40-foot cuts, 20-foot wide entries and 68-foot length diagonals at intersections were supported by substantial evidence (JA 26-29). The Commission vacated and remanded the ALJ's findings as to ventilation quantities, as well as certain other issues, finding that such rulings did not include the necessary findings of fact and explanations to comport with Commission Procedural Rule 69(a), 29 C.F.R. § 2700.69(a) (JA 29-30). The Commission also found that the ALJ correctly determined that the District Manager did not abuse his discretion in his use of a Procedure Instruction Letter in denying Prairie State's request for a 40-foot cut (JA

---

[7]        At the time of the decision, the Commission had two vacancies.

30-31).  Finally, the Commission found that the ALJ did not abuse her discretion in excluding evidence of plans of other mines or evidence offered by Prairie State's experts (JA 31-32).

The dissenting Commissioner asserted that the majority applied the wrong standard of review (JA 34).  He stated that the Commission has long held that the Secretary bears the burden of establishing that the operator's plan as to the disputed condition was unsuitable and that the Secretary's proposal is suitable (JA 34).  He believed that the ALJ short-circuited the process by avoiding the threshold question of unsuitability of Prairie State plans.  He stated that the Commission confused the burden of proof with a standard of review.  He asserted that the majority's decision is inconsistent with the Mine Act, the language of the governing standards and established precedent (JA 35).  He relied, in part, on this Court's decision in <u>Zeigler Coal Co. v. Kleppe</u>, 536 F.2d 398 (JA 36).  He rejected reliance upon cases involving emergency response plans ("ERP") which the two member majority relied upon (JA 38-39).  He also rejected the application of the arbitrary and capricious standard as undermining the Commission's authority and responsibility to act as an arbiter in plan disputes.

## III.   The ALJ's Decision on Remand

On remand, the ALJ noted that the only issue that remained in contest of those remanded to her was the amount of air required in the last open crosscut (JA

45).  The ALJ found that the District Manager did not abuse his discretion in requiring the mine to have 20,000 to 25,000 cfm of air in the last open crosscut despite the use of fishtail ventilation (JA 48).  The ALJ found that the District Manager's decision with respect to the required amount of air was not arbitrary and capricious, not made in bad faith and not due to an error in judgment (JA 48).  She relied upon the testimony of an MSHA witness about the quantity of air and ignored evidence that the quantity proposed by Prairie State is used at another mine with the best record in the District on control of respirable dust (JA 48).  There was no evidence as to what the District Manager actually considered (JA 47-48).  She further imposed civil penalties for the two citations (JA 49).

## STANDING

Pursuant to Federal Rule of Appellate Procedure 28.1(c)(2) and D.C. Circuit Rule 28(a)(7), Prairie State submits that standing is clear from the administrative record in that Prairie State has suffered an injury in the form of civil penalties resulting from the Commission's decision, which is contrary to law and that this Court can redress the injury.  Further, Prairie State has suffered injury by having to operate under the roof control and ventilation plans that were imposed by MSHA.  Moreover, Section 106(a)(1) of the Mine Act, provides that any person adversely affected or aggrieved by an order of the Commission issued under the Mine Act may obtain a review of such order in any United States Court of Appeals for the

Circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Columbia Circuit by filing in such court within 30 days following the issuance of such order a written petition praying that the order be modified or set aside. 30 U.S.C. § 816(a)(1).

## SUMMARY OF ARGUMENT

Prairie State seeks the reversal of the Commission's holding that the Citations were affirmed. The standard of review the Commission upheld, that of whether the District Manager acted arbitrarily and capriciously, was improper. The ALJ and Commission confused the burden of proof with an appellate standard of review on appeal of rules promulgated pursuant to notice and comment rulemaking. Essentially they held that the District Manager was a finder of fact and adjudicatory function. The standard should have been whether the Secretary sustained his burden of proof that the plans proposed by Prairie State were unsuitable for the mine, and if so, whether MSHA's plans were suitable. The use of an arbitrary and capricious standard to evaluate a District Manager's decisions concerning what are essentially to be individual mandatory standards, is wholly inappropriate. The Commission's interpretation, in conjunction with the exclusion of other relevant evidence and expert testimony, further deprives Prairie State of a full opportunity for a de novo hearing. Further, the ALJ's refusal to permit evidence concerning plans that were not placed before the District Manager and the refusal to consider evidence readily available to the District Manager was improper. The District Manager's reliance upon policy documents which he interpreted as binding and across-the-board interpretations was improper and even

- 19 -

if an arbitrary and capricious standard were applied, was in fact arbitrary and capricious and contrary to well established Commission case law.

## ARGUMENT

I.    **The Commission Should Not Have Affirmed the ALJ's Application of an Arbitrary and Capricious Standard to Determine if Prairie State's Plans Met the Requirements of the Standard**

A mine operator may not lawfully operate its coal mine without a ventilation or roof control plan approved by the MSHA district manager, that is "suitable to the conditions and the mining system" at the mine. 30 U.S.C. § 862(a) and § 863(o). Sections 75.370 and 75.220 of 30 C.F.R. implement sections 302(a) (requiring adoption of approved roof control plans) and Section 303(o) (requiring adoption of approved ventilation plans) of the Mine Act.

Section 303(o) provides:

A ventilation system and methane and dust control plan and revisions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator….

30 U.S.C. § 863(o).

Section 302(a) provides in pertinent part:

Each operator shall undertake to carry out on a continuing basis a program to improve the roof control system of each coal mine and the means and measures to accomplish such system….A roof control plan and revisions thereof suitable to the roof conditions and mining system of each coal mine and approved by the Secretary shall be adopted….

30 U.S.C. § 862(a).

- 20 -

Section 75.370(a)(1) provides, in relevant part, that ventilation plans are to

be developed by the operator:

> The operator shall develop and follow a ventilation plan approved by
> the district manager.  The plan shall be designed to control methane
> and respirable dust and shall be suitable to the conditions and mining
> system of the mine.  (Emphasis supplied)

Section 75.220(a)(1) provides in relevant part that roof control plans are also

to be developed by the operator:

> Each mine operator shall develop and follow a roof control plan,
> approved by the District Manager that is suitable to the prevailing
> geological conditions, and the mining system to be used at the mine.
> Additional measures shall be taken to protect persons if unusual
> hazards are encountered.  (Emphasis supplied)

The process of plan development, as historically contemplated by the

various parties, was one of good faith negotiation.  See, e.g., Carbon County Coal

Company, 7 FMSHRC 1367, 1371 (Rev. Comm. Sept. 1985).

The Commission has long held that the Secretary bears the burden of

establishing that the operator's plan (in the particulars of its disputed provision(s))

is unsuitable.  See, e.g., Peabody Coal Co., 18 FMSHRC 686, 690 (Rev. Comm.

May 1996); Peabody Coal Co., 15 FMSHRC 381, 387-88 (Rev. Comm. March

1993); C.W. Mining Co., 18 FMSHRC 1740, 1748-53 (Rev. Comm. Oct. 1996);

Carbon County Coal Co., 7 FMSHRC 1367 (Rev. Comm. Sept. 1985).

Instead, the ALJ here evaluated this matter from the standpoint of the

Secretary's proposed requirements (JA 16).  She rejected any consideration of the

suitability of Prairie State's plan because it was a new mine without previously approved plans (JA 16). She did not evaluate the suitability of the plans proposed by Prairie State (JA 16). She stated that "the Secretary must show that the District Manager did not abuse his discretion in determining that the MSHA-proposed ventilation and roof control plans are suitable to the conditions at the Lively Grove Mine" (JA 16). The Commission majority also rejected any evaluation of the plans by the ALJ from a suitability standpoint and approved the ALJ's use of an arbitrary and capricious standard (JA 25, n.6). These rulings are directly contrary to the principles set out in Zeigler Coal Co. v. Kleppe, 536 F.2d 398 (D.C. Cir. 1976):

> The statute makes clear that the ventilation plan is not formulated by the Secretary, but is "adopted by the operator." While the plan must also be approved by the Secretary's representative, who may on that account may have some significant leverage in determining its contents, it does not follow that he has anything close to the unrestrained power to impose terms.

536 F.2d at 406-07 (citations omitted).[8]

Inherent in the Zeigler holding is that it is the operator's proposal that is being evaluated, not the Secretary's. The Commission's and ALJ's holding is also contrary to the longstanding Commission case law on the burden of proof.

As the dissent here noted, the ALJ and the Commission avoided the threshold question of unsuitability (JA 35; see JA 25, n.6). By moving directly to

---

[8]     While the decision in Zeigler involved the provisions of the Federal Coal Mine Health and Safety Act of 1969 ("1969 Act"), the provisions concerning plans were substantially the same to what is in the Mine Act.

the evaluation of the suitability of the Secretary's plan under the least rigorous standard in the law, the Commission effectively replaces the burden of proof with a deferential "review" of the District Manager's negotiating position (JA 35). The Commission over-simplifies the problem of reviewing plan decisions by assuming away the issue. Instead of requiring the Secretary to carry the burden of proof on any substantive matter, the majority allows the Secretary to prevail simply by demonstrating that the District Manager's decision-making, i.e., the process through which the plan was evaluated and replaced, met the minimum standard for reasonableness under the law. When combined with the exclusion of evidence at hearing, this essentially removed any development of a record from the ALJ on the substantive plan issues.

This is fundamentally erroneous for a number of reasons. It is inconsistent with the language of the Act, the language of the standards, the decision of this Court in Zeigler and long established precedent. Further, in the context of this case, application of such process in conjunction with the exclusion of other plans, information developed within the district, and expert testimony, precluded any kind of meaningful hearing before the Commission.

The language in the standards imposes on operators the duty to "develop" or "propose" plans for roof control and ventilation, respectively. This obligation has been recognized, almost from the beginning of coal mine safety jurisprudence, as a

- 23 -

"peculiar species of promulgation in which <u>the operator himself adopts</u>" the governing standard. <u>Zeigler Coal Co. v. Kleppe</u>, 536 F.2d at 406 (emphasis added). Indeed, in that case this Court recognized the operator's role in developing the governing standard to be applied at its mine is essential to its holding in <u>Zeigler</u>. Because such plans "appear to be developed by informal negotiations between the operator and the Secretary's representative, without any pretense of compliance with § 101," <u>Zeigler</u>, 398 F.2d at 403, the Court felt compelled to read beyond the plain language of the Mine Act's precursor, the 1969 Act, to hold that ventilation plans, though not literally "mandatory standards" under the defined terms of the Act must be enforceable as such for the Act to be fully effective. The <u>Zeigler</u> Court's construction was expressly approved by Congress in enacting the Mine Act. S. Rep. No. 95-181, 95th Cong., 1st Sess. 25 (1977), cited in <u>UMWA v. Dole</u>, 870 F.2d 662, 669 (D.C. Cir. 1989).

Logically, a plan may be rejected only if it is unsuitable, because the Secretary must establish that as a basis for disapproval. <u>See</u> <u>Zeigler</u>, 536 F.2d at 406 (statute clearly requires operator, not Secretary to adopt plan; Secretary lacks "<u>anything close to unrestrained power to impose terms</u>") (emphasis added). To permit the Secretary to substitute a plan merely because he believes that MSHA's plan is more suitable, confers that very power and negates the operator's responsibility to develop and implement the plans. This fundamentally transforms

- 24 -

the process, in a manner at odds with the language in the governing standards. Thus, it follows that the Secretary (who bears the burden of proof) must demonstrate that the operator's plan is unsuitable. The Commission and the ALJ ignored this and circumvented the Mine Act.

The solidity of the law on this point is best illustrated by the fact that the Commission majority itself cites, C.W. Mining, 18 FMSHRC 1740 (Rev. Comm. Oct. 1996) (JA 25-26). That case does not support the majority's position, but on the contrary, C.W. Mining further cemented, as binding precedent, the use of the burden of proof requiring the Secretary to prove that the operators' plans were unsuitable and, if so, his plan provisions were suitable. C.W. Mining at 1748-54. The majority in this case ignored the central and controlling holding in C.W. Mining. Moreover, it also ignored the fact that the issue in C.W. Mining was whether the operator negotiated in good faith, which is a distinct issue from the issue here. C.W. Mining at 1746-54.

While the Commission majority cited two other cases applying the arbitrary and capricious standard, neither is controlling or even persuasive, for each applied the standard in distinct and unusual circumstances. Emerald Coal Resources, LP, 29 FMSHRC 956 (Rev. Comm. Dec. 2007), considered for the first time the approval of emergency response plans under the Mine Improvement and New Emergency Response Act of 2006 ("MINER Act"), a set of amendments to the

- 25 -

Mine Act.  The MINER Act required approvals of emergency response plans to be carried out by the Secretary (not the district managers), on an accelerated timetable and specified the provisions that were required to be included in all plans.  Thus, plan approval or disapproval centered on a tightly-focused set of criteria developed by Congress, subject to approval by "the Secretary," not a district manager.

At the time, there were no implementing regulations.  See Emerald Coal, 29 FMSHRC at 957-58 (noting that 30 U.S.C. § 876(b)(2)(A) of the MINER Act required that operators develop ERPs and submit them for approval by the Secretary within 60 days after the date of the statute's enactment on June 15, 2006).[9]  Arguably, the ERP requirements are not even delegated lawmaking in any meaningful sense, for the direction given to the Secretary is to ensure that all plans met Congressionally-mandated standards.  See also Twentymile Coal Co., 30 FMSHRC 736, 748 (Rev. Comm. Aug. 2008).  This standard involves a review of the record to determine "whether the Secretary properly exercised her discretion and judgment in the plan approval process."  Twentymile, 30 FMSHRC at 748.

---

[9]      See 71 Fed. Reg. 12252 (2006) (MSHA issued Emergency Temporary Standard under MINER Act, but did not address emergency response plans ("ERP")); MSHA Program Policy Letter No. P06-V-8 (July 21, 2006), Program Policy Letter No. P06-V-9 (Aug. 4, 2006), Program Policy Letter No. P06-V-10 (Oct. 24, 2006) (all providing guidance for implementing ERPs); 71 Fed. Reg. 71430 (2006) (MSHA final rule implementing requirements of MINER Act addressed in Emergency Temporary Standard and reconciling Emergency Temporary Standard with MINER Act).

The Commission also described this standard as one of whether the District Manager's decision was "reasonable."  30 FMSHRC at 748.

But further, it is questionable whether the arbitrary and capricious standard of review should extend even to the ERP context let alone beyond it.  The problem, of course, with such analysis focuses primarily on the process and ignores the substance of the plans themselves.  In Emerald and Twentymile, the Commission based its application of the arbitrary and capricious standard largely on language from C.W. Mining, which stated that, "absent bad faith or arbitrary action, the Secretary retains the discretion to insist upon the inclusion of specific provisions as a condition of the plan's approval."  Twentymile, 30 FMSHRC at 748; Emerald, 29 FMSHRC at 956 (citing C.W. Mining, 18 FMSHRC at 1746).  While that language, appeared in C.W. Mining, it was as part of its discussion of good faith negotiations, not a standard of review.

There is also a question as to whether this test is the appropriate one for adjudicating plans.  Plans are different.  They are rules imposed without the protection of notice and comment rulemaking.  See, e.g., Zeigler, 536 F.2d at 407; Carbon County I, 6 FMSHRC at 1127; Martin County Coal Company, 28 FMSHRC 247, 274 (Rev. Comm. May 2006) (Duffy concurring); Jim Walter Resources, Inc., 28 FMSHRC 579 (Rev. Comm. Aug. 2006).  They are imposed though a bargaining process where the parties have grossly unequal bargaining

positions.  The arbitrary and capricious standard requires the least scrutiny of the Secretary's exercise of authority.  <u>See</u>, <u>e.g.</u>, <u>Administrative Law and Practice</u> § 11.22.  It is the same standard of review applied to rules developed under notice and comment rulemaking.  <u>See</u>, <u>e.g.</u>, <u>Kennecott Greens Creek Mining Company v. MSHA</u>, 476 F.3d 946, 952 (D.C. Cir. 2007); <u>National Industrial Sand Ass'n. v. Marshall</u>, 601 F.2d 689 (3d Cir 1979).  Given the absence of protections, it is an inappropriate standard of review.

No doubt the Secretary will rely on the Seventh Circuit's decision in <u>Mach Mining, LLC v. Secretary of Labor</u>, 728 F.2d 643 (7th Cir. 2013), which upheld the same ALJ's use of the "arbitrary and capricious" standard and also her rejection of evidence that was not submitted to the MSHA District Manager during plan negotiations but that directly related to the propriety of the disputed plan, but <u>Mach Mining</u> turns this Court's decision in <u>Zeigler Coal Co.</u>, on its head.  Specifically, the decision in <u>Mach Mining</u> disregards the importance of the operator's role and expertise in the development of the plan, which this Court in <u>Zeigler</u> considered to be fundamental in counteracting concerns involving the enforcement of plan provisions as mandatory standards despite the fact that such provisions were not enacted with the protections provided by Section 101 of the Act.  The decision in <u>Mach Mining</u> eliminates the protections against the use of a mine plan to circumvent the promulgation of mandatory standards and

significantly impairs an operator's ability to achieve relief in a plan dispute.  Mach Mining requires operators to establish that MSHA's decision to deny a plan was done in a way that was outside the bounds of its discretion rather than establishing the soundness or validity of the operator's plan.  Such decision runs contrary, as this Court held in Zeigler, to the contention that the plan is the operator's and not MSHA's.

The Mine Act does not lend support to the notion that an administrative law judge with a statutory mandate to hear enforcement disputes de novo and make findings of fact after weighing the evidence should accord deferential review to the informal decisions of a single mid-level agency official.  See United States v. Mead Corp., 533 U.S. 218, 229-31 (2001).  It's a standard of review that is appellate in nature.  The ventilation and roof control plan submission and approval process is simply an informal negotiation over ventilation standards that make sense for a particular mine.  The process is not an actual rulemaking and the operator has no protection against MSHA's conduct: no formal rules govern the process, no record is assembled, and no findings are required to be made by the district manager.  Indeed, in this case, Prairie State and MSHA negotiated the plan contents for over a year and MSHA arbitrarily changed its position and refused to yield, despite the fact that the policy documents the District Manager relied upon were not binding.  Essentially, such standard of review assumes the record is fully

developed before it gets to a hearing stage. Such approach undermines the very process of plan negotiations.

That is why a different "standard of review" is necessary and appropriate. It is more appropriate to utilize, not a standard of review, but a burden of proof that has been established for years to evaluate plan provisions of the operator for reasonableness and suitability. Only if they are not, then MSHA's provisions would be considered. This would be consistent with the language requiring the operator to adopt the plan in both the Mine Act and Sections 75.370(a)(1) and 75.220. That the reasonableness of MSHA's decision-making process should be evaluated, instead of the reasonableness of what the operator has proposed, is not consistent with the provisions of the Mine Act that it is the operator that develops the plan. It is inconsistent with the mantra that has been recited to operators by MSHA personnel over the years and in light of the holding in Ziegler that ventilation and roof control plans are "your plans."

## A.    The Application of an Arbitrary and Capricious Standard is Inconsistent with the ALJ's Role.

The Mine Act directs Commission ALJs to adhere to the APA hearing procedures. See 30 U.S.C. § 815(d) (hearings to be conducted "in accordance with section 554 of title 5"); 5 U.S.C. § 554(c)(2) (directing hearings to be conducted "in accordance with section 556," *inter alia*). What the APA contemplates is a hearing de novo. See 1 Richard J. Pierce, Admin. L. Treatise § 8.2, at 702-03 (5th

ed. 2010) (explaining that the full complement of trial-type procedures are afforded parties entitled by statute to a hearing on the record under 5 U.S.C. § 554).

The Commission itself has long recognized that its ALJ hearings are de novo and that the Secretary, not operator, must carry the burden of proof by a preponderance of the evidence. See Consolidation Coal Co., 11 FMSHRC 966, 973 (Rev. Comm. July 1989); Kenny Richardson, 3 FMSHRC 8, 12, n.7 (Rev. Comm. Jan. 1981) ("The usual standard of proof required in an administrative proceeding is a preponderance of the evidence, and we hold that this is the appropriate standard of proof in proceedings before Commission administrative law judges.") (citing 2 Am. Jur. 2d Admin. Law § 932, at 199)); *accord* 29 C.F.R. § 2700.63(b).

Where the Commission erred was in substituting, at the hearing stage, a deferential standard of review for the traditional evidentiary standard of proof. There is nothing additional in the Mine Act that carves out any exceptions to this burden of proof; there is no basis for an administrative law judge to resort to the APA's standard of judicial review of final agency action in rulemaking proceedings. See 5 U.S.C. § 706. More fundamentally, requiring the ALJ to conduct a hearing de novo is consistent with her position. The Supreme Court has commented on the role of administrative law judges:

> There can be little doubt that the role of modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556(c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.

Butz v. Economu, 438 U.S. 478, 513 (1978). In other words, the job of an administrative law judge is to hear evidence and testimony, weight it, and make findings.

Furthermore, the Mine Act litigation scheme in particular was intended and designed for trial-type litigation, replete with rights of discovery, depositions, and expert testimony. See 29 C.F.R. Part 2700, subpart G (Commission procedural rules governing hearings); see id. § 2700.1(b) ("Applicability of other rules". On any procedural question not regulated by the Act, these Procedural Rules, or the Administrative Procedure Act (particularly 5 U.S.C. [§§] 554 and 556), the Commission and its Judges shall be guided so far as practicable by the Federal Rules of Civil Procedure and the Federal Rules of Appellate Procedure."). In contrast, the arbitrary-and-capricious standard is not a fact-finding standard at all; it is a standard for judicial review of final agency action. Compare 5 U.S.C. § 556(d) with 5 U.S.C. § 706.

- 32 -

But more importantly, an approach using an arbitrary and capricious standard of review will destroy the plan development process. It will require an operator to act as if the negotiation process will not succeed and, as a precaution, engage in a "data dump" before the District Manager of any material it may use at hearing and any experts it might consider using at a hearing. It will turn the negotiation into an adversarial process which will defeat its very purpose.

### 1.    The Commission's Approval of the Exclusion of Evidence Was Improper

Application of the arbitrary and capricious standard is one for appellate review. In this instance, the ALJ, utilizing that standard, limited evidence that Prairie State could offer and not only deprived Prairie State of an actual <u>de novo</u> hearing but even violated the principles of the application of an arbitrary and capricious standard (<u>see</u>, <u>e.g.</u>, JA 452-1011, PSGC 58-103)(excluded exhibits).

Even under an arbitrary and capricious standard, the District Manager has certain obligations. In <u>Twentymile Coal Company</u>, two Commissioners in a separate opinion stated that the District Manager must "examine the relevant data." 30 FMSHRC at 754 (citing <u>Motor Vehicle Mfr's Ass'n v. State Farm Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983)). The ALJ limited the evidence that the District Manager should have considered to the specific mine rather that what was readily available to him.

The ALJ did not admit evidence concerning plans that were approved at other mines in District 8. She granted a motion in limine by the Secretary to that effect (JA 18). She further did not admit evidence of studies conducted in District 8 concerning the taking of 40-foot extended cuts (JA 18). She rejected evidence of studies conducted by NIOSH concerning the taking of 40-foot extended cuts (JA 18). The Commission upheld these exclusions simply on the basis of the ALJ's authority to exclude evidence that is "irrelevant, unduly repetitious or cumulative" (JA 31). It ignored the cases that mandate consideration of all relevant evidence.

The ALJ further refused to credit the testimony of Prairie State's experts because such testimony was not presented to the District Manager before his decision (JA 16, 18, 19). Such rejection is inconsistent with any objective evaluation as to whether the District Manager acted appropriately let alone the suitability of the plans. See, e.g., Alabama By-Products, 4 FMSHRC 2128 (Rev. Comm. Dec. 1982).

The focus should not be on what information was placed before the District Manager by the operator with respect to the mine at issue at the time he made his decision. Such approach is, as the ALJ here recognized at hearing, inconsistent with the manner in which plans are developed in the real world (JA 61, Tr. 23; see also JA 129, Tr. 294; JA 131, Tr. 302). It is also inconsistent with how MSHA behaves: here the District personnel offered the plan that had been approved at

another mine as a template (JA 131, Tr. 303-04).[10]   It is also an issue of fundamental fairness:  to permit one mine to have the advantage of a particular plan provision and deny the benefits of the same provision to another operator is fundamentally unfair and makes MSHA the arbiter of competitive advantage.

In Twentymile, the Administrative Law Judge granted the Secretary's motion in limine to preclude evidence of the approval of plans in other districts that were similar to the one advanced by the operator.  On review, the Commission split evenly over whether barring this evidence was appropriate.  Twentymile, 30 FMSHRC at 764-66 & 778-79.  In Twentymile, this left the Administrative Law Judge's ruling undisturbed, but the issue remains unresolved as to the probative value of approved plans and data from other mines.  Here the two Commissioners in the majority affirmed such exclusion (JA 32).

But even if this limitation is accepted, this issue is broader than simply evaluating the evidence the District Manager had before him for the specific mine. The ALJ also  rejected other evidence of studies of other mines or NIOSH studies, even if not specifically raised by the operator to the District Manager.  But that is also "relevant data," especially if it is going to be argued that MSHA has some special "expertise," although that may not be the case. The arbitrary and capricious

---

[10]    It might be noted that here, as in other cases, the provisions of other mines' plans were, in fact, placed before the District Manager (JA 123, Tr. 272).

standard requires an agency "to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962).

Reasoned decision-making necessarily includes evaluation of information readily available to the District Manager and his subordinates. The District Manager also does not make decisions in isolation. He uses both ventilation and roof control supervisors as resources (JA 111, Tr. 223). They review the plans for him (JA 111, Tr. 223; JA 116, Tr. 244). He has a wealth of information available to him so he can make an informed decision.[11] In this case this did not happen and the ALJ and Commission permitted it.

In her apparent effort to confine her consideration to only what was before the District Manager, the ALJ ignored such evidence but in so doing she erred, as did the Commission in affirming the decision. If the arbitrary and capricious standard and reasonableness is applied, the consideration of these types of evidence is vital to determining if the District Manager acted appropriately. The ALJ has constructed a plan process where the District Manager does not have to

---

[11]     His failure to use that type of information as well as the information provided by Prairie State and the information he was aware of resulted in a decision that not only was arbitrary and capricious but unsupported by substantial evidence. See, e.g., Administrative Law and Practice § 11.22.

avail himself of and account for information that is readily available to him.  She also, in essence, required the operator to submit all information, including information MSHA has readily available, and even its potential expert witness testimony to the District Manager before his decision in order to offer such evidence at hearing.  Such approach to the evidence presented in plan cases is improper and review of such rulings should be granted.

## II.    The Commission Erred in Not Reversing the ALJ When She Did Not Hold that the District Manager Acted Arbitrarily and Capriciously When He Applied Policy as a Binding Norm

The ALJ's and Commission's evaluation was also significantly flawed because the District Manager applied policy as a binding rule (JA 610).  Prairie State proposed that it be permitted to take 40-foot extended cuts.  The District Manager refused to approve that request on the basis that he would not approve such a plan provision for a new mine or even for a new working section in a mine with an existing 40-cut plan provision (JA 112, Tr. 225-26).  He had interpreted an MSHA policy document as requiring such approach (JA 112, Tr. 225-26).  The District Manager made it clear, as did his subordinates, that he understood the Procedure Instruction letter, No. 108-V-03 (M-14), as a binding rule (JA 112, Tr. 225-26).  He stated:

> Q. Now, the whole issue of 40-foot cuts, you considered that to be an across-the-board requirement that you couldn't get the 40-foot cuts without going through this evaluation process?

A. Yes.  It didn't apply [only] to this mine.  It applied to other mines in the district.

Q. Applied to everybody who wanted a new MMU or a new section or a new mine; is that right?

A. Yes, sir.

Q. It applied to a new section or an MMU in a mine even if they already had approval for 40-foot cuts?

A. Yes, sir.  (JA 112, Tr. 226-27)[12]

The U.S. Court of Appeals of the Eleventh Circuit has ruled that the Procedure Instruction Letter is not a binding rule; otherwise it would necessarily be required to go through notice and comment rulemaking under Section 101 of the Mine Act.  National Mining Association v. Secretary of Labor, 589 F.3d 1368 (11th Cir. 2009).  This error alone renders the rejection of Prairie State's plan provisions permitting 40-foot cuts as arbitrary, capricious and unreasonable, if the standard is applied.  Application of this policy as binding means that the District Manager failed to consider all relevant data, as he must do.  The ALJ rejected this argument, indicating, in essence, that it was not improper to so apply the Procedure Instruction Letter, or other across-the-board rules (JA 17).  Such holding was in error.  She saw the policy directives as simply "guiding" him, but his other testimony contradicts that and indicates that he was controlled by them.

---

[12]    There appears to be an error or omission in the transcript concerning the District Manager's statement that "it didn't apply to this mine."  The context of his statement is that the rule applied to Lively Grove.

In <u>Peabody Midwest Mining LLC</u>, 32 FMSHRC 892 (ALJ Manning July 6, 2010) the ALJ addressed the application of a Program Policy Letter by a District Manager as a binding norm. He held that the PPL there was not a rule that was subject to notice and comment rulemaking but held as follows:

> I find that the 200-foot guideline contained in the PPL for tracking miners in the working sections was treated as a binding norm by the District Manager in these cases. I find that the District Manager abandoned his discretion when he imposed a 200-foot tracking requirement in the working sections of both mines based on the PPL because he mechanically applied the PPL to both mines. His decision was arbitrary because he based that requirement, not on any particular conditions present at the mines, but on the language of the PPL (Slip Opinion at 17).

Further, the imposition of across-the-board requirements is inconsistent with the fundamental premise of mine-specific plan development. The plan process is a unique form of rulemaking under the Act. It does not subject the rules created in plans to notice and comment rulemaking under Section 101(a) of the Act, 30 USC § 811(a), but nonetheless the Secretary's ability to impose rules upon an operator in the plan process has limitations.

In <u>Zeigler Coal Co. v. Kleppe</u>, this Court also explained that a plan must not serve as a means to set forth additional general requirements that could be applied to all mines. The Court believed that this precept provided an additional protection against the use of a mine plan to circumvent the promulgation of mandatory standards. It explained as follows:

- 39 -

A less apparent but more significant restriction on the Secretary's power to use the ventilation plan as a vehicle for avoiding more stringent procedural requirements, arises from the plan provisions obvious purpose to deal with unique conditions peculiar to each mine….The [plan requirement] was not to be used to impose general requirements of a variety well-suited to all or nearly all coal mines, but rather to assure that there is a comprehensive scheme for realization of the statutory goals in the particular instance of each mine.

Zeigler Coal, 536 F.2d at 407.

A series of cases before the Commission involving the Carbon County Coal Co., built upon the principles announced in Zeigler.  In Carbon County Coal Co., 6 FMSHRC 1123 (Rev. Comm. May 1984), the Review Commission reviewed Zeigler and adopted its distinction between a negotiated plan requirement and a rule of general applicability, which must be promulgated as a mandatory standard. In a second decision, Carbon County Coal Co., 7 FMSHRC 1367 (Rev. Comm. Sept. 1985), the Review Commission conclusively established that MSHA's insistence upon a particular provision was a rote application of the national and district policy guidelines and held that MSHA violated the Act's plan approval procedure.  Carbon County, 7 FMSHRC at 1373.[13]  Thus the use of the binding

---

[13]    To the extent that dicta in United Mine Workers of America v. Dole, 870 F.3d 662 (D.C. Cir. 1989), that MSHA has "final responsibility" on plan approvals, is read to weaken the rulings in Zeigler and Carbon County, it should be noted that it did not specifically reject either decision but cited them favorably.  Under Dole, it was still recognized that mine plans must be tailored to the specific conditions of a mine, even if they do include certain universal provisions.  More importantly, Dole was not specifically a case involving plan provisions.

"policy" directly contravenes the plan process but the Commission majority ignored its own case law and that of this Court and held that the District Manager did not abuse his discretion in the use of the Procedure Instruction Letter (JA 31).

Prairie State also proposed other roof plan provisions concerning the width of entries, the sum of the diagonals at intersections and ventilation quantities that the District Manager rejected on the basis of across-the-board rules (JA 112, Tr. 225; JA 137, Tr. 326; JA 236). For example, MSHA insisted on applying an entry width of 18 feet and a diagonal distance of 64 feet (JA 347). It was just this sort of District-wide rules that was rejected in Carbon County and for that reason alone the District Manager's decision was unreasonable, arbitrary and capricious because it was contrary to law and the Commission's decision otherwise was in error. More fundamentally, such approach completely undermines the plan process of the operator developing a plan. Under this approach the operator is constrained to use MSHA's plan.

## III. An Examination of the Specific Plan Provisions Indicates the ALJ Erred in Upholding the District Manager's Decision

### A. Extended Cuts

The ALJ upheld the District Manager's decision to reject the proposed 40-foot cuts (JA 12-13). The ALJ's decision was contrary to law and unsupported by substantial evidence. Further, it exemplifies how Prairie State's plan, if evaluated,

improved safety.[14]  The District Manager rejected the safer plan for one that was not as safe.  He, of course, did so on the basis of what he believed was a binding rule, but an examination of the evidence makes it clear that the rejection of the 40-foot cut provision was unreasonable and arbitrary and capricious for reasons beyond the application of a policy as a binding one and that the provision was certainly suitable to the mine.

A fundamental premise of any analysis of this issue is the recognition that the majority of the mines in District 8 and elsewhere that utilize continuous miners have approval for extended 40-foot cuts (JA 164, Tr. 433).  In fact, both a power point on roof control relied upon by the District Manager and a document he had sent out in May 2009 to describe the requirements for plans clearly assumed the use of 40-foot cuts (JA 281, 315).  Finally, it must be recognized that continuous miners, with scrubbers, are designed to operate in extended cuts (JA 164, Tr. 434).

The two issues with respect to the length of cuts are ventilation (methane and respirable dust control) and roof control.  There is no doubt that roof control is not a significant issue (JA 170, Tr. 458; JA 419, PSGC 98).  Although the District Manager did not look at the engineering data offered to him on August 6, 2009,

---

[14]    Under a "substantial evidence" test the Court must, of course, consider whatever in the record fairly detracts from the weight of the evidence that supports the ALJ's decision.  See, e.g., Plateau Mining Corp. v. FMSHRC, 519 F.2d 1176, 1194 (10th Cir. 2008); Midwest Materials Co., 19 FMSHRC 30, 34, n.5 (Rev. Comm. Jan. 1997).

even the data he was provided, the ARMPs data, clearly demonstrates that the roof at the mine is good. The ARMPs analysis is one that MSHA relies upon and it demonstrated that there was a safety factor, not of 1.5, as sought by MSHA, but as much as five times that (JA 136, Tr. 324; JA 338, PSGC 23).

The primary and most important component of the roof at Lively Grove is Brereton limestone (JA 139, Tr. 336; JA 171, Tr. 462).[15] It is extremely strong and is the reason mines in the immediate area of Lively Grove have such good roof conditions (JA 139, Tr. 336; JA 171, Tr. 462). Further both industry practice and the mandatory standards make it clear that, if the roof would not sustain the taking of 40 foot cuts, shorter cuts would be taken (JA 156, Tr. 403; JA 167, Tr. 445). Moreover, it must be recognized that in the area where the cut is being taken there are no miners because the area being mined is beyond the permanent supports.

The ALJ ignored this evidence as well as the expert testimony that the mine could safely use extended cuts (JA 12-13). The Commission majority upheld the ALJ because it believed that 20 foot cuts were "safer" (JA 28). But the expert testimony, however, corroborated what was evident. In lieu of relying on the expert testimony, the ALJ relied upon generalizations, such as a supervisor from the District's testimony that he believed the roof could best controlled with 20-foot

---

[15] The analysis of Prairie State's roof control expert confirmed what was known: there is no significant difference between the roof conditions on a 20-foot versus a 40-foot cut (JA 172, Tr. 466).

cuts, but this testimony did not, in fact, address the roof conditions in 40-foot cuts (JA 13).    The ALJ's approach to analyzing the evidence ignored the specific information as to the roof in the mine as did the Commission.

In terms of ventilation, the lack of support for the Secretary's position is even more glaring.    The research that the District Manager was familiar with indicated that the ventilation in a cut that extended beyond the normal 20 feet was as good, if not better than in the first 20 feet (JA 117, Tr. 246; see also JA 131, Tr. 306; JA 134, Tr. 313, 315; JA 131, Tr. 344; JA 157, Tr. 407; JA 163, Tr. 431). This makes sense for two reasons.    First, the portion of the cut that produces the most respirable dust is the start of the cut and the number of cut starts is reduced in extended 40-foot cuts (JA 152, Tr. 385; JA 163, Tr. 431-32).    Further, once the cut advances sufficiently, the dust is encapsulated around the head of the continuous miner and is taken into the scrubber, which captures it (JA 163-164, Tr. 432-33). As the continuous miner goes beyond 20 feet, there is less turbulence the farther it is beyond the curtain and this improves the capture of respirable dust by the scrubber (JA 164, Tr. 436).    The deeper the cut the better the overall ventilation. In fact, the ventilation is optimal around 30 feet into the cut (JA 117, Tr. 246).    The District Manager's subordinates were also fully familiar with that research (JA 132, Tr. 306; JA 134, Tr. 313-14).    He ignored this information.

- 44 -

As the District Manager was clearly aware, the presence of methane will not be a problem at Lively Grove.  He was or should have been aware, just as Prairie State's engineer made himself aware, of the methane liberation of mines in the immediate area of the mine (JA 128-129, Tr. 291-93).  He would have had that data readily available to him, and it would have been less than responsible or diligent if he failed to check that data if he were not familiar with it.  Mr. Eslinger, the District Manager's direct subordinate, was aware of that data (JA 129, Tr. 293).[16]  The District Manager ignored this data.

But even more importantly, the ALJ, the Commission and the District Manager ignored significant safety benefits that derive from 40-foot cuts.  The moving of mining equipment, especially continuous miners, creates significant hazards of injuries from such movement (JA 115, Tr. 238-39).  The District Manager knew of 37 fatalities from such a hazard (JA 115, Tr. 238-39).[17]  The use of 40-foot extended cuts reduces the potential for injury by half because the

---

[16]     There are, of course, protections in the mandatory standards to prevent the accumulation of methane to explosive levels, e.g., regular methane test requirements, methane monitors on the continuous miners, and requirements that the continuous miner be deenergized automatically when levels well below the lower explosive limitation detected.  See 30 C.F.R. §§ 75.323, 75.342(c) and 75.362(d).

[17]     Unfortunately, there appears to have been additional such fatalities since the ALJ's decision as reported on MSHA's website.  See, e.g.,
                www.msha.gov/FATALS/2010/FAB10c33.asp
                www.msha.gov/FATALS/2010/FAB10c36.asp
                www.msha.gov/FATALS/2010/FAB10c39.asp

equipment needs to move only half as often (JA 152, Tr. 386; JA 165, Tr. 440; see also JA 132, Tr. 306). This includes the roofbolter as well as the continuous miner (JA 165, Tr. 439). There has been a reduction in fatal accidents from mining of face equipment since the advent of 40-foot extended cuts (JA 165, Tr. 438). The more moves with a continuous miner and other equipment the greater potential for injury from an equipment move (JA 152, Tr. 386). MSHA itself is engaged in rulemaking to address this issue by the use of proximity detection devices, rejecting the so-called "administrative controls" that the Secretary's witness relied upon (JA 83, p. 10). <u>See</u> 76 Fed. Reg. 54163-54179 (2011).

The ALJ also rejected the testimony of Prairie State's expert on this issue as "generalization" but that is simply not correct (ALJ 9). He had actually analyzed the issues on which he testified and was specific as to the basis of testimony. He has, for example, actually studied the issue of equipment injuries (JA 165-166, Tr. 439-442). The District Manager simply ignored these very significant safety benefits in applying his across-the-board rule requiring an operator to start with 20 foot cuts and the ALJ should have held that he acted arbitrarily and capriciously in so doing.

The ALJ and Commission also relied upon the fact that Lively Grove is a new mine and that it cannot be known for absolute certainty what the conditions will be (JA 17). She used that to reject reliance upon Prairie State's witnesses (JA

17). Such approach ignores the use of engineering data and experience and fails to address the expected conditions on a mine-specific basis (JA 162, Tr. 426-28).[18] It rejects the facts available about the mine and the proposed provisions and applies an impermissible across-the-board approach. It also ignores the provisions in the standards with respect to roof control and ventilation plans, which provide for a review of the plan provisions every six months.

If the Commission's and ALJ's approach is accepted, no plan provisions could be approved until mining is conducted. No standards could be enacted because it could not be known what mining conditions would be encountered until mining occurred. Also, it is clear that MSHA fully expects to grant approval of extended cuts: it included provisions to be applied to extended cuts when approval is granted (JA 347, 353). There was no basis provided by the Secretary for delaying approval given the obvious and undisputed safety benefits.

MSHA offered no substantive justification for prohibiting 40-foot cuts from the beginning of mining, and the ALJ referenced none.[19] Essentially, the District

---

[18]    As Prairie State's expert testified, it was highly unlikely that roof conditions would be adverse (JA 167, Tr. 445-46). These conditions have been confirmed by mining (JA 158, Tr. 409-10).

[19]    The Secretary failed to produce any study or other evidence that the District Manager might have relied upon that shows that ventilation or respirable dust control is worse in extended 40-foot cuts than on 20-foot cuts. There are apparently no such studies (JA 165, Tr. 438).

Manager relied upon the policy in rejecting Prairie State's proposal. Judge

Manning in <u>Peabody Midwest</u> rejected this sort of approach to a complex subject.

> Despite the complaints of these tracking systems, the District Manager chose to simply require Peabody to amend its ERP to include a 200-foot tracking system in its working sections.

> An administrative agency must "examine the relevant data and articulate a satisfactory explanation for its action including a ʹrational connection between the facts found and choices made.'" <u>Twentymile Coal</u> at 754. The District Manager did not do this in the present cases. His statement that he always enforces the 200-foot guideline confirms that me only superficially considers the specific miners in his district, if at all, when reviewing ERPs.

32 FMSHRC at 910-911.

Because of the advantages in respirable dust control and equipment injuries

of 40-foot cuts, an explanation of why such advantages are being ignored by the

ALJ and the Commission majority is necessary. Even if one leaves aside the fact

that the adoption of such an across-the-board approach is contrary to Commission

case law and is therefore, in and of itself, arbitrary and capricious, such decision

ignores the benefits of such mining method without evidence of any significant

disadvantage.

The ALJ and the Commission ignored the evidence (JA 17). Not only was

she incorrect, especially as to ventilation issues, but that was not the standard here.

The standard is whether what Prairie State proposed provided the appropriate

measure of safety and the evidence was clear that it did so and its plan was, in fact, suitable.

### B.    Width of Entries and Length of Diagonals

Prairie State sought to be able to mine 20-foot wide entries with 68-foot diagonals at the intersections. The ALJ and the Commission discussed the evidence in a cursory fashion (JA 13, 29) and evaluated the issue from the perspective of MSHA's proposed limitations to 18-foot wide entries and 64-foot diagonals. The decisions were in error for several reasons. She relied upon general testimony without discussing the roof control issues that were mine-specific. Their decisions in this regard are not supported by substantial evidence.

Further, the District Manager applied an across-the-board policy and this resulted in him ignoring the evidence. The District Manager and the ALJ failed to consider the mine-specific ARMPs data that MSHA requires an operator to submit (JA 116, Tr. 244, 323; JA 338, PSGC 23). That data shows a safety factor for 20-foot wide entries for the Lively Grove Mine that is four to five times what MSHA considers acceptable (JA 136-37, Tr. 324-25; JA 338, PSGC 23 at p. 2 of 5). In addition, the District Manager and the ALJ failed to consider the type of rock in the roof, Brereton limestone, which is strong and competent (JA 139, Tr. 336). The District Manager further declined to consider the other engineering data that Prairie State offered (JA 137, Tr. 325-26; JA 148-49, Tr. 372-73).

The analysis performed by Prairie State's expert, Murali Gadde, indicated that 20-foot wide entries provided for acceptable roof control (JA 169, Tr. 456).[20] While 18-foot wide entries provided some additional support, it was not a significant amount and the 20-foot wide entries were adequate (JA 170, Tr. 458). The stresses in a 20-foot wide entry did not exceed the strength of the material (JA 170, Tr. 457). The ALJ ignored this evidence but it is, in fact, highly probative.

The Secretary did not offer any evidence concerning the issue of the importance of the orientation of entries for roof control and the District Manager obviously did not evaluate this issue. Prairie State's engineer, however, testified as to the importance of this issue (JA 145, Tr. 357-58). He designed Lively Grove to take advantage of the orientation of the entries (JA 145, Tr. 358-59). As Mr. Daiber described in a letter dated July 29, 2009, the mine will have the best ground control in the District (JA 338, PSGC 23), which the Secretary did not substantively dispute.

The District Manager also misunderstood the width of entries Prairie State was proposing. He thought they were still proposing 22-foot wide entries, not 20-foot wide entries (JA 111, Tr. 224). This misunderstanding undermines the

---

[20]    Mr. Gadde is a well-qualified expert with a doctorate in mining engineering and an expert on roof/ground control issues (JA 168, Tr. 449-52). He was offered and accepted by the Secretary as an expert on ground control (JA 169, Tr. 453; PSGC 91).

Secretary's assertion of a basis for rejection based upon conditions:  the rejection

was based on an across-the-board rule concerning entry widths.

The Secretary argued that there has been a reduction in roof falls in District

8 since the District adopted its 18-foot rule but the District actually did no analysis

of why this occurred (JA 113, Tr. 232; JA 145, Tr. 359).  The District Manager

could not testify as to how many falls were in entries wider than 20 feet, or how

many came as a result of changes in one mine, or were the result of the age of the

entries, or the result of noncompliance with plan provisions (JA 113, Tr. 231-32).

This sort of information is necessary, especially since the roof falls in District 8

tend to occur principally in certain mines (JA 103, Tr. 192).

The ALJ and the Commission referenced information provided to the

District Manager by a roof control "authority" who did not testify, Casey Sears (JA

13, 29).  The District Manager did not provide Mr. Sears with any of the data the

District had collected on reported roof falls so that a useful analysis could be done

(JA 114, Tr. 233; JA 315, <u>see</u> M-19).  Mr. Sears' power point that the Secretary

offered provides little information on what Mr. Sears did (JA 315).[21]  But closer

analysis, as Prairie State performed using MSHA's own data, demonstrates the

inappropriateness of this argument.  The bulk of the reduction in roof falls was on

---

[21]    An examination of this power point reveals it to be embarrassingly devoid of substance and applicability to the conditions at Prairie State (JA 315).  It certainly cannot be considered substantial evidence to support a decision.

the eastern side of the Illinois basin where the ground conditions are different than where Lively Grove is located (JA 145, Tr. 360).

Furthermore, the District Manager's across-the-board approach and the ALJ's limited decision failed to take into consideration additional safety benefits of wider entries. Wider entries and greater diagonals provide for more room to maneuver equipment reducing the potential for equipment moving injuries (JA 134, Tr. 316; JA 137, Tr. 327; JA 142, Tr. 346; JA 165-66, Tr. 440-41). The effect of the narrower entries has been proven out by experience, as the District Manager would surely have known (JA 135, Tr. 318). This is particularly true in the face area where the ventilation curtain narrows the entry to 14 feet and the shuttle cars are maneuvering behind the continuous miner (JA 149, Tr. 374). Wider entries also reduce the potential for electrical cable damage (JA 166, Tr. 441) and wider entries provide for better ventilation and respirable dust control (JA 134, Tr. 316; JA 142, Tr. 346; JA 166, Tr. 442). The ALJ addressed these issues with only a cursory sentence (JA 13).

The ALJ and the Commission referenced a report that the District 8 roof control supervisor relied upon that shows that roof falls tend to occur at intersections and that the District Manager relied upon information from Mr. Sears (JA 13, 29; JA 94, Tr. 155-56; JA 306, M-16). Such evidence was general in nature and was not substantial evidence that would support a rejection of Prairie

State's plan. It was not the sort of specific evidence Prairie State offered. Further, the report used by the Secretary to support the testimony that was offered did not recommend the specific diagonal distances required by MSHA but did reference data from mines where the distances were greater than what Prairie State proposed (JA 306, 312). The power point prepared by Mr. Sears recommended a diagonal distance of 64 feet in mines with weak roof, which did not apply to Lively Grove (JA 109, Tr. 215-16; JA 315, M-19). There was no indication that Lively Grove would be such a mine; the roof was (and is) strong and competent (JA 139, Tr. 336; JA 158, Tr. 409-10; JA 171, Tr. 462). This report and power point otherwise provide no support for the District Manager's position in adopting an across-the-board diagonal distance or entry width. But they do highlight that the ALJ and the Commission refused to consider Prairie State's proposed provisions on a mine-specific basis.

Just as the District Manager's across-the-board approach failed to consider mine-specific information and relied upon general information that has no probative value, the ALJ's decision was not supported by substantial evidence and was contrary to law.

### C.    Ventilation Quantities

Prairie State proposed that the ventilation quantities at the last open crosscut be 9,000 and 12,000 cfm respectively, depending on the number of open crosscuts

that would be maintained (JA 130, Tr. 300). Prairie State did this on the basis that they would utilize "fishtail" ventilation where intake air is brought to the section in middle entries and then split to ventilate separate portions of the section with the returns on the outside entries (JA 130, Tr. 300; JA 141, Tr. 343; PSGC 104). This is to be contrasted with a section where air comes in on one side and exits the other, passing over all the equipment in the section (JA 130, Tr. 300; JA 141, Tr. 343). Fishtail ventilation is more effective for control of respirable dust and methane and Prairie State intended to use it for this reason (JA 130, Tr. 300; JA 139, Tr. 334). Prairie State's proposal provides a requirement of either a total of 18,000 to 24,000 cfm for the section that almost equals the totals imposed by MSHA (JA 131, Tr. 301). In fishtail ventilation each entry intake air ventilates half as many entries as a section ventilated across all the faces (JA 450).

The quantities were based, in part, on research on the MSHA website into the respirable dust compliance histories at other mines in the District (JA 131, Tr. 301). Prairie State's engineer discovered that the Gateway Mine, which utilizes fishtail ventilation, has one of the best respirable dust compliance histories in District 8 and utilizes this type of ventilation with the quantities approved by MSHA that Prairie State sought (JA 131, Tr. 302).

MSHA sought quantities of 20,000 and 25,000 cfm, irrespective of whether fishtail ventilation was used (JA 140, Tr. 338), although the deficiency letter on

which the ALJ relied in a generic fashion only "recommended" such quantities (JA 261). These were an across-the-board requirement according to the District Manager (JA 115, Tr. 238). The District Manager also apparently assumed that Prairie State intended to use a system where one intake entry ventilated all the entries of the section (JA 115, Tr. 238). The Secretary offered no justification for such quantities, either on the basis of expected methane liberation or any other basis. The District simply said that such quantities were necessary to meet the ventilation requirements in each face, ignoring that the air that ventilates one face ventilates the rest of the downwind faces and the air does not disappear. There was no basis in fact for any of the opinions of District personnel upon which the ALJ relied.[22]

It must be recognized what District 8's position and the ALJ's decision mean. Prairie State will utilize fishtail ventilation which is safer than across-the-section ventilation, but MSHA will require approximately double the ventilation than it would if Prairie State utilized a less effective method of section ventilation. The only conclusion that can be drawn from the District Manager's decision is that it was arbitrary, capricious and unreasonable but also that also consideration of the Prairie State Plan would have revealed a different result. It did not consider the

---

[22]    The Commission did not review the ALJ's decision on remand which was limited to this issue.

specific ventilation system of the mine.   The ALJ, however, relied upon the testimony of an inspector and the District Manager, which did not provide a substantial basis for the decision (JA 13).

## **CONCLUSION**

Based on the foregoing, it is requested that the Commission's decision reversed and that the Citations be vacated.

Respectfully submitted,

By: /s/ Ralph Henry Moore, II
    Ralph Henry Moore, II
    Patrick W. Dennison
    Jackson Kelly PLLC
    Three Gateway Center, Suite 1500
    401 Liberty Avenue
    Pittsburgh, PA  15222-1000
    412-434-8055
    412-434-8062 fax

    Attorneys for
    Prairie State Generating
    Company, LLC

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.      This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because this Brief contains 12,655 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows© 2010 in 14-point, Times New Roman font.  This Brief and related attachments, including the addendum, as submitted in digital form, have been scanned for viruses using Sophos Endpoint Security and Control, Version 10.0, last updated on 05/05/2014, and, according to the program, are free of viruses.

/s/ Ralph Henry Moore, II
Ralph Henry Moore, II
Patrick W. Dennison

Attorney for Prairie State
Generating Company LLC

Dated:  05/05/2014

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that service of Prairie State Generating Company LLC's foregoing Brief was made upon the following, by forwarding a true and exact copy thereof via electronic filing and overnight courier this 5th day of May, 2014, addressed as follows:

Edward Waldman, Esq.
U.S. Department of Labor
Office of the Solicitor
1100 Wilson Boulevard, 22nd Floor
Arlington, VA  22209-2249


John T. Sullivan, Esq.
Federal Mine Safety & Health
  Review Commission
1331 Pennsylvania Avenue, NW
Suite 520N
Washington, D.C. 20004-1710



/s/ Patrick W. Dennison

V0042713

# ADDENDUM A

## Addendum Containing Statutes and Standards

### 30 U.S.C. § 814(a)

(a)    Issuance and form of citations; prompt issuance If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the chapter, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation. The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter.

### 30 U.S.C. § 862

(a)    Roof control plan; review; availability

Each operator shall undertake to carry out on a continuing basis a program to improve the roof control system of each coal mine and the means and measures to accomplish such system.  The roof and ribs of all active underground roadways, travelways, and working places shall be supported or otherwise controlled adequately to protect persons from falls of the roof or ribs.  A roof control plan and

revisions thereof suitable to the roof conditions and mining system of each coal mine and approved by the Secretary shall be adopted and set out in printed form within sixty days after the operative date of this subchapter.  The plan shall show the type of support and spacing approved by the Secretary.  Such plan shall be reviewed periodically, at least every six months by the Secretary, taking into consideration any falls of roof or ribs or inadequacy of support of roof or ribs.  No person shall proceed beyond the last permanent support unless adequate temporary support is provided or unless such temporary support is not required under the approved roof control plan and the absence of such support will not pose a hazard to the miners.  A copy of the plan shall be furnished the Secretary or his authorized representative and shall be available to the miners and their representatives.

**30 U.S.C. § 863**

(o)     Methane and dust control plans; contents

A ventilation system and methane and dust control plan and revisions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator and set out in printed form within ninety days after the operative date of this subchapter.  The plan shall show the type and location of mechanical ventilation equipment installed and operated in the mine, such additional or improved equipment as the Secretary may require, the quantity and velocity of air reaching each working face, and such other

information as the Secretary may require. Such plan shall be reviewed by the operator and the Secretary at least every six months.

## 30 U.S.C. § 75.220(a) – Roof control plan.

(a)(1)  Each mine operator shall develop and follow a roof control plan, approved by the District Manager, that is suitable to the prevailing geological conditions, and the mining system to be used at the mine. Additional measures shall be taken to protect persons if unusual hazards are encountered.

## 30 U.S.C. § 75.370(a)(1) – Mine ventilation plan; submission and approval.

(a)(1)  The operator shall develop and follow a ventilation plan approved by the district manager. The plan shall be designed to control methane and respirable dust and shall be suitable to the conditions and mining system at the mine. The ventilation plan shall consist of two parts, the plan contest as prescribed in § 75.371 and the ventilation map with information as prescribed in § 75.372. Only that portion of the map which contains information required under § 75.371 will be subject to approval by the district manager.